UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| CONSTANCE LORRAINE,<br><br>Plaintiff,<br><br>v.<br><br>NORMAN L. WALLIN, et. al.,<br><br>Defendants. | Case No. 3:16-cv-00409-MMD-WGC<br><br>**ORDER** |

### I. APPLICATION FOR LEAVE TO PROCEED IN FORMA PAUPERIS

A person may be granted permission to proceed in forma pauperis (IFP) if the person "submits an affidavit that includes a statement of all assets such [person] possesses [and] that the person is unable to pay such fees or give security therefor. Such affidavit shall state the nature of the action, defense or appeal and affiant's belief that the person is entitled to redress." 28 U.S.C. § 1915; *Lopez v. Smith*, 203 F.3d 1122, 1129 (9th Cir. 2000) (en banc) (stating that this provision applies to all actions filed in forma pauperis, not just prisoner actions).

In addition, the Local Rules of Practice for the District of Nevada provide: "Any person, who is unable to prepay the fees in a civil case may apply to the court for authority to proceed *in forma pauperis*. The application must be made on the form provided by the court and must include a financial affidavit disclosing the applicant's income, assets, expenses, and liabilities." LSR 1-1.

"'[T]he supporting affidavits [must] state the facts as to [the] affiant's poverty with some particularity, definiteness and certainty.'" *U.S. v. McQuade*, 647 F.2d 938, 940 (9th Cir. 1981) (quoting *Jefferson v. United States*, 277 F.2d 823, 725 (9th Cir. 1960)). A litigant need not "be absolutely destitute to enjoy the benefits of the statute." *Adkins v. E.I. Du Pont De Nemours & Co.*, 335 U.S. 331, 339 (1948).

A review of Plaintiff's application reveals that she is unable to pay the filing fee. As a result, Plaintiff's application to proceed IFP (ECF No. 1) will be granted.

## II. SCREENING

**A. Standard**

28 U.S.C. § 1915 provides: "the court shall dismiss the case at any time if the court determines that...the action or appeal (i) is frivolous or malicious; (ii) fails to state a claim upon which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief. 28 U.S.C. § 1915(e)(2)(B)(i)-(iii). This provision applies to all actions filed in forma pauperis, whether or not the plaintiff is incarcerated. *See Lopez v. Smith*, 203 F.3d 1122, 1129 (9th Cir. 2000) (en banc); *see also Calhoun v. Stahl*, 254 F.3d 845 (9th Cir. 2001) (per curiam).

Dismissal of a complaint for failure to state a claim upon which relief may be granted is provided for in Federal Rule of Civil Procedure 12(b)(6), and this court applies the same standard under Section 1915(e)(2)(B) when reviewing the adequacy of the complaint or amended complaint. *See Resnick v. Hayes*, 213 F.3d 443, 447 (9th Cir. 2000) (citation omitted). Review under 12(b)(6) is essentially a ruling on a question of law. *See Chappel v. Lab. Corp. of America*, 232 F.3d 719, 723 (9th Cir. 2000).

In reviewing the complaint under this standard, the court must accept as true the allegations of the complaint, *Hosp. Bldg. Co. v. Trustees of Rex Hosp.*, 425 U.S. 738, 740 (1976), construe the pleadings in the light most favorable to plaintiff, and resolve all doubts in the plaintiff's favor, *Jenkins v. McKeithen*, 395 U.S. 411, 421 (1969). Allegations in pro se complaints are held to less stringent standards than formal pleadings drafted by lawyers, and must be liberally construed. *See Hughes v. Rowe*, 449 U.S. 5, 9 (1980); *Haines v. Kerner*, 404 U.S. 519, 520-21 (1972) (*per curiam*); *Hamilton v. Brown*, 630 F.3d 889, 893 (9th Cir. 2011).

A complaint must contain more than a "formulaic recitation of the elements of a cause of action," it must contain factual allegations sufficient to "raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "The pleading must contain something more...than...a statement of facts that merely creates a suspicion [of] a

1 legally cognizable right of action." *Id*. (quoting 5 C. Wright & A. Miller, Federal Practice and
2 Procedure § 1216, at 235-36 (3d ed. 2004)). At a minimum, a plaintiff should state "enough
3 facts to state a claim to relief that is plausible on its face." *Id*. at 570; *see also Ashcroft v. Iqbal*,
4 556 U.S. 662, 678 (2009).

5       A dismissal should not be without leave to amend unless it is clear from the face of the
6 complaint that the action is frivolous and could not be amended to state a federal claim, or the
7 district court lacks subject matter jurisdiction over the action. *See Cato v. United States*, 70 F.3d
8 1103, 1106 (9th Cir. 1995) (dismissed as frivolous); *O'Loughlin v. Doe*, 920 F.2d 614, 616 (9th
9 Cir. 1990).

**B. Plaintiff's Complaint**

      Plaintiff brings this action against the following defendants: Norman L. Wallin (salesman at Fiat of Reno), Kevin Sheppard (sales manager at Fiat of Reno), Aaron M. White (of Weinstein & Riley, P.S.), Sergio Marchionne (CFO of Chrysler Capital) and Santander Consumer USA, Inc. for Chrysler Capital. (ECF No. 1-1 at 1.) She lists out the following claims on the caption page: 1) financial elder abuse; 2) intentional (actual) fraud; 3) fraudulent inducement to enter into a contract; 4) unfair business practices (Chapter 598A); 5) intentional infliction of emotional distress; 6) Trust in Lending violation; 7) Equal Credit Opportunity Act; and 8) theft of her supposed trade in. (*Id*.)

      Plaintiff states that she is 86 years old, and was 85 when she met Defendants, and has several disabilities, including that she is legally blind in her left eye and has loss of hearing in her right ear. (ECF No. 1-1 at 3.)

      On July 18, 2015, Plaintiff was at the Fiat of Reno car dealership with her son who wanted to buy a Fiat. (*Id*.) Salesman Wallin asked her if she was interested in buying a Fiat too, and she told him she had a fixed income and a terrible credit score, but Wallin told her that her credit score did not matter. (*Id*.) Wallin asked to check out her Ford Explorer as a trade-in, and she told Wallin her car was paid for, she just had new tires put on, and had spent $1,500 for work on the car. (*Id*.) She also advised him her total monthly income was $736.00 from Social

- 3 -

1  Security, and she could not afford more than $200 per month for a car and insurance. (*Id*. at 3-4.)
2  Wallin said he did not think that would be a problem. (*Id*. at 4.)

3  She subsequently told Wallin she could not afford the Fiat, and asked for her car keys
4  back. (*Id*.) She had not seen or driven a Fiat at that juncture (eight hours after they had arrived).
5  (*Id*.) The sales manager, Kevin Sheppard, told her they had already removed the plates from her
6  car, had it detailed, and had moved it to their used car lot. (*Id*.) She asked to see a contract, what
7  the length was, and the payments, and Sheppard told her she would not understand it anyway.
8  (*Id*.)  She was then shown a black Fiat through the glass doors of the showroom, and ushered to
9  the back of a building in a dimly lit room and told to sign the papers, which she could not read
10  because the print was small and it was a dark room. (*Id*.) She claims she was induced to enter
11  into a contract, and was not advised she had three days after delivery to cancel the contract and
12  have her trade-in returned. (*Id*.) She was told her son had left and was driving his new car; but,
13  her son later told her he was just checking out the new car. (*Id*.)

14  She found her way back to Sheppard's office, and was then taken outside where Wallin
15  programmed the new car, explained the key system and left her there alone. (*Id*. at 5.) She called
16  the dealership two days later to tell them she wanted to cancel the contract and return the car, and
17  was told that Wallin had quit, and that her old car had been sold. (*Id*.) She subsequently got a call
18  from the dealership that they wanted the car back because they could not finance it, and she told
19  them she would be glad to return it as soon as she got her car back (which they could not do
20  because it had been sold). (*Id*.)

21  When she eventually got the paperwork from Chrysler, it showed that the payment and
22  insurance were over $500, which was more than she could afford. (*Id*.) She attaches a copy of a
23  Federal Truth in Lending disclosure statement to the complaint, indicating her monthly payment
24  would be $383.56, for just the car, when she represented she could not afford more than $200.
25  (*Id*.) She claims she was given only $500 for her old vehicle, and was charged $38.63 in sales tax
26  for her old car. (*Id*. at 6, 7.)

27  She avers that she was pressured by the car salesmen into purchasing the car and
28  unnecessary items including a vehicle protection plan (for $2,250, which was not explained to

- 4 -

her) and an alarm (for $399, which had been represented to her as being free). (*Id.* at 7.) She claims this incident caused her severe mental and emotional distress. (*Id.*) She seeks to void the transaction. (*Id.*)

**C. Analysis**

    **1. Financial Elder Abuse**

Plaintiff was over 65, and Defendants wrongfully took her car in bad faith, and charged her more than advertised for the vehicle based on her age and vulnerabilities. (ECF No. 1-1 at 8.) She further contends that they took advantage of her by giving her only $500 for her vehicle, stating that was all it was worth, while she claims it was worth at least $3,000. (*Id.* at 8-9.)

The court presumes Plaintiff is asserting a claim of elder abuse under Nevada law. Specifically, NRS § 41.1395(1) states:

> [I]f an older person or a vulnerable person suffers a personal injury or death that is caused by abuse or neglect or suffers a loss of money or property caused by exploitation, the person who caused the injury, death or loss is liable to the older person or vulnerable person for two times the actual damages incurred by the older person or vulnerable person.

Here, the alleged abuse would be loss of property by exploitation. The statute defines "exploitation" as:

> (b) any act taken by a person who has the trust and confidence of an older person or a vulnerable person or any use of the power of attorney or guardianship of an older person or a vulnerable person to:
> (1) Obtain control, through deception, intimidation or undue influence, over the money, assets or property of the older person or vulnerable person with the intention of permanently depriving the older person or vulnerable person of the ownership, use, benefit or possession of that person's money, assets or property; or
> (2) Convert money, assets or property of the older person with the intention of permanently depriving the older person or vulnerable person of the ownership, use, benefit or possession of that person's money, assets or property.

NRS 41.1395(4)(b)(1)-(2).

Plaintiff states a colorable claim for elder abuse under Nevada law against Wallin and Sheppard.[1]

---

[1] The court recommends, *infra*, that Plaintiff be allowed to proceed with a claim under the federal Truth in Lending Act; therefore, the court may exercise supplemental jurisdiction over Plaintiff's State law claims, which are substantially related to the federal claim. 28 U.S.C. § 1367(a).

**2. Intentional Fraud**

Plaintiff alleges that Defendants made false statements of material fact, they knew to be false, particularly when sales manager Sheppard stated Plaintiff's car's plates had been removed, the card had been detailed and moved to a used car lot and could not be returned. (ECF No. 1-1 at 9.) Plaintiff claims that she relied on the statements to her detriment. (*Id*.) She states that additional false statements were made regarding her credit score not being a detriment to her purchasing a new 2015 vehicle for $200 per month. (*Id*.) These statements induced her to enter into a sales contract, causing her significant financial and emotional damage. (*Id*. at 10.)

The elements of a common law fraud claim in Nevada are: (1) the defendant made a false representation; (2) the defendant knew or believed the representation was false or had an insufficient basis for making the representation; (3) the defendant intended to induce the plaintiff to act or refrain from acting in reliance upon the misrepresentation; (4) the plaintiff justifiably relied on the misrepresentation; and (5) damage to the plaintiff resulted from such reliance. *Bulbman, Inc. v. Nevada Bell*, 825 P.2d 588, 592, 108 Nev. 111 (Nev. 1992) (citation omitted).

Plaintiff states a colorable common law fraud claim under Nevada law against Wallin and Sheppard.

**3. Fraudulent Inducement to Enter into a Contract**

Plaintiff alleges that Defendants used lies, trickery, deceit and false pretenses to force Plaintiff into a position to purchase a new vehicle from them. (ECF No. 1-1 at 10.) As such, she alleges the transactions are void as against public policy. (*Id*.)

"A party to a contract may seek rescission of that contract based on fraud in the inducement." *Awada v. Shuffle Master, Inc.*, 173 P.3d 707, 713, 123 Nev. 613, 622 (Nev. 2007). To establish fraud in the inducement, a plaintiff must establish that: (1) the defendant made a false representation, (2) that it knew or believed to be false or had an insufficient basis on which to make the representation, (3) the defendant intended to convince the plaintiff to enter into the contract, (4) the plaintiff justifiably relied on the representation, and (5) damages resulted. *See J.A. Jones Constr. Co. v. Lehrer McGovern Bovis, Inc.*, 89 P.3d 1009, 1018, 120 Nev. 277, 290-91 (2004).

Plaintiff states a colorable claim for fraud in the inducement against Wallin and Sheppard under Nevada law.

**4. Unfair and Deceptive Business Practices**

She alleges that Defendants actions were designed to induce her into entering into a purchase agreement, and to seek additional costs and fees to the detriment of Plaintiff. (ECF No. 1-1 at 11.) She claims that Defendants did not believe their statements to be true, and Plaintiff justifiably relied on their position of trust and authority to her detriment. (*Id*.)

She states that as a result, she suffered damages of intentional fraud under 15 U.S.C. § 45. This statute gives the Federal Trade Commission (FTC) the power to prevent persons and corporations from using unfair methods of competition and unfair or deceptive acts of practices affecting commerce. 15 U.S.C. § 45(a)(2). It allows the FTC "to issue and serve upon such person, partnership or corporation a complaint stating its charges in that respect" and to conduct a hearing. It does not give Plaintiff a right to file a private action.

On the other hand, Nevada law prohibits deceptive trade practices when a person:
> [I]n the course of his or her business or occupation...:
> ...
> 11. Advertises goods or services as being available free of charge with intent to require payment of undisclosed costs as a condition of receiving the goods or services.
> ...
> 13. Makes false or misleading statements of fact concerning the price of goods or services for sale or lease, or the reasons for, existence of or amounts of price reductions.
> ...
> 15. Knowingly makes any other false representation in a transaction.
> ...

Nevada Revised Statute (NRS) 598.0915.  In addition, a person engages in a deceptive trade practice in Nevada when the person:
> (9) Fails, in a consumer transaction that is rescinded, cancelled or otherwise terminated in accordance with the terms of an agreement, advertisement, representation or provision of law, to promptly restore to a person entitled to it a deposit, down payment or other payment or, in the case of property traded in but not available, the agreed value of the property ....
> (12) Knowingly takes advantage of another person's inability reasonably to protect his or her own rights or interests in a consumer transaction when such an inability is due to illiteracy, or to a mental or physical infirmity or another similar

- 7 -

condition which manifests itself as an incapability to understand the language or terms of any agreement.

NRS 598.021(9), (12).

Additional deceptive trade practices include: the failure to disclose a material fact in connection with the sale or lease of goods or services, NRS 598.0923(2); violation of a state or federal state regulating the sale of goods or services, NRS 598.0923(3); the use of coercion, duress or intimidation in a transaction, NRS 598.0923(4).

An elderly person (defined as sixty or older under NRS 598.0933), may bring a civil action for injury resulting from a deceptive trade practice, and may recover actual damages, punitive damages, and reasonable attorney's fees. NRS 598.0977.

Plaintiff has stated colorable claims for deceptive trade practices under Nevada law against Wallin and Sheppard.

**5. Intentional Infliction of Emotional Distress**

A plaintiff asserting an intentional infliction of emotional distress claim in Nevada must allege: "(1) extreme and outrageous conduct with either the intention of, or reckless disregard for, causing emotional distress, (2) the plaintiff's having suffered severe or extreme emotional distress and (3) actual or proximate causation." *Star v. Rabello*, 97 Nev. 124, 125, 625 P.2d 90, 92 (Nev. 1981).

Plaintiff alleges that Defendants conduct described in detail in the complaint was extreme and outrageous, and as a result she suffered severe mental and emotional distress. (ECF No. 1-1 at 12.) Therefore, she states a colorable intentional infliction of emotional distress claim under Nevada law against Wallin and Sheppard.

**6. Violation of the Federal Truth in Lending Act (TILA)**

Plaintiff alleges she was an elder as defined under the Federal Welfare & Institutions Code, and Defendants had a duty to treat her with care and deal with her in good faith and ensure all TILA disclosures were clear, conspicuous and accurate. (ECF No. 1-1 at 12.) She claims that she signed one document indicating her monthly payment would be $383.56, which she was unable to read or comprehend, which was false and deceptive, misleading and confusing to the average elderly consumer. (*Id.*) She also alleges this constitutes illegal "payment packing," and is

- 8 -

a predatory lending activity. (*Id.*) As a result, she claims she is entitled to rescind the loan agreement. (*Id.* at 13.) She also argues that a violation of Regulation Z (TILA's implementing regulation) occurred insofar as the Defendants failed to take into account her ability to repay the car loan. (*Id.*) She indicates she never received from Fiat of Reno or Chrysler Capital an opportunity to cancel the contract within three days in a separate document as required under TILA. (*Id.*) She called on July 20, 2015, and attempted to cancel the contract but was told she could not. (*Id.*)

TILA, 15 U.S.C. § 1601, *et. seq.*, was enacted on May 29, 1968 as part of the Consumer Credit Protection Act. Pub. L. 90-321. Its implementing regulation is referred to as Regulation Z, 12 C.F.R. 226.1, *et. seq.*, and TILA became effective July 1, 1969. TILA requires that creditors disclose certain information in consumer credit transactions. 15 U.S.C. § 1638. Its purpose is "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit ...." 15 U.S.C. § 1601(a).

TILA requires that borrowers receive written disclosures regarding important terms of credit before they are legally bound to pay the loan, including the APR, finance charge, amount financed, total payments, number of payments, monthly payment, and due dates of payments. 15 U.S.C. 1638(B). A creditor who fails to comply with the requirements is civilly liable for actual and statutory damages. 15 U.S.C. § 1640(a).

Plaintiff states that Defendants violated TILA when they did not give her notice of the opportunity to cancel the contract within three days. (ECF No. 1-1 at 13.) This is not a disclosure required by TILA. The right to rescind under TILA is afforded when the person to whom credit is extended grants a security interest "in any property which is used as the principal dwelling," 15 U.S.C. § 1635(a), which is not the case here. It should be noted that the buyer of an automobile does not have a right of rescission or any "cooling off" period under Nevada law

1 either. *See* http://www.dmv.org/nv-nevada/buy-sell/state-regulations.php,
2 http://www.dmvnv.gov/regdealer.htm, last visited Aug. 15, 2016.[2]

3     The TILA form she signed, and which she attached as an exhibit to the complaint,
4 contains a provision that she agreed to furnish any documentation necessary to verify the
5 information contained in her credit application, and acknowledges that it may take a few days for
6 seller to verify credit and assign the contract, and in consideration of the seller agreeing to give
7 possession of the vehicle, she agreed that if seller was unable to assign a contract to a financial
8 institution, then *seller* may elect to rescind the contract. (ECF No. 1-1 at 21.) If seller gives
9 notice of election to rescind, the buyer must immediately return the vehicle, and seller agrees to
10 restore all consideration received, including any trade-in vehicle. This provision did not give
11 *Plaintiff* a right to rescind. Rather, if she was given notice of seller's intent to rescind, and she
12 returned the Fiat immediately, the seller was obligated to return consideration paid, including her
13 trade-in vehicle. If this did not occur, Plaintiff may have a state law claim for breach of contract,
14 but not a federal claim under TILA.[3]

15     She also states that she signed a document (the TILA disclosures) which indicated a
16 monthly payment of $383.56, but she was unable to read or comprehend this document. (ECF
17 No. 1-1 at 12.)

18     Regulation Z requires that the disclosures be made "clearly and conspicuously in writing,
19 in a form that the consumer may keep." 12 C.F.R. § 226.17. The creditor must disclose "[t]he
20 number, amount, and due dates or period of payments scheduled to repay the total of payments."
21 15 U.S.C. § 1638(a)(2)(B)(6); 12 C.F.R. § 226.18(g). The staff commentary to Regulation Z
22 states:

---

[2] In Nevada, the dealer may take up to twenty days to arrange financing under the terms of the sale, and if financing cannot be arranged, the dealer has three options: (1) rescind the sale and require return of the vehicle, (2) finance in-house under the original terms, or (3) ask the buyer to sign a new contract under different terms (which buyer is not obligated to accept, and if the buyer does not accept the buyer may return the vehicle). http://dmvnv.com/regdealer.htm, *last visited* Aug. 15, 2016.

[3] According to Plaintiff's complaint it appears that she was given notice of the seller's intent to rescind when financing could not be obtained, and she told them she "would be glad to return the new car as soon as [she] received [her] car back[,]" and at that point she was told they could not return the car because it had already been sold. (ECF No. 1-1 at 5.)

> This standard requires that the disclosures be in a reasonably understandable form. For example, while the regulation requires no mathematical progression or format, the disclosures must be presented in a way that does not obscure the relationship of the terms to each other. In addition, although no minimum type size is mandated (except for the interest rate and payment summary for mortgage transactions required by § 228.18(s)), the disclosures must be legible, whether typewritten, handwritten, or printed by computer.

12 C.F.R. Pt. 226, Supp. I, Subpt. C, § 226.17(a)(1).

The disclosure indicates that plaintiff would make 71 payments monthly starting on September 1, 2015, in the amount of $383.56, and that she would make another payment of $383.56 on August 1, 2021. (ECF No. 1-1 at 19.) In light of Plaintiff's allegations that she was forced to read the disclosures in a dimly lit room, with small type, the court finds Plaintiff should be allowed to proceed with a claim under TILA.

Elsewhere in the complaint, Plaintiff states that she was charged $399 for an alarm which had been represented to her as being free; as well as $2,250 for a vehicle protection plan which she claims was not properly explained to her, she did not agree to, and that she was pressured into accepting. (ECF No. 1-1 at 6.) Under TILA, the "amount financed" must be disclosed. 16 U.S.C. § 1638(a)(2), (3). The "amount financed" is "the amount of credit of which the consumer has actual use." 16 U.S.C. § 1638(a)(2)(A). This is computed by "tak[ing] the principal amount of the loan or the cash price less downpayment and trade-in;" and "add[ing] in any charges which are not part of the finance charge or of the principal amount of the loan and which are financed by the consumer...;" and "subtract[ing] any charges which are part of the finance charge but which will be paid by the consumer before or at the time of the consummation of the transaction, or have been withheld from the proceeds of the credit."
16 U.S.C. § 1638(a)(2)(A)(i)-(iii); *see also* 12 C.F.R. § 226.18(b)(1)-(3).

The itemization for the amount financed included disclosure of the alarm fee of $399, and the optional service contract in the amount of $2,250. (ECF No. 1-1 at 19.) Plaintiff claims that the alarm fee should not have been included in the amount financed because it had been represented to her as being free, and that the vehicle protection plan should not have been included because she had not agreed to it. (ECF No. 1-1 at 6.) The court finds that Plaintiff states

- 11 -

1  a colorable claim that the Defendants violated TILA and Regulation Z when they disclosed items
2  under the amount financed that Plaintiff alleges should not have been included.
3       Plaintiff appears to allege a TILA violation based on the allegation that she was not given
4  the required TILA disclosures prior to consummation of the credit transaction.
5       TILA requires that disclosures be made "before consummation of the transaction."
6  12 C.F.R. § 226.17(b). A credit transaction consummates at "the time that a consumer becomes
7  contractually obligated on a credit transaction." 12 C.F.R. § 226.2(a)(13). State law governs
8  when a consumer becomes contractually obligated on a credit transaction. *Jackson v. Grant*, 890
9  F.2d 118, 120 (9th Cir. 1989).
10       The complaint does not specifically state when the TILA disclosures were given to her;
11  but, it does allege that *after* her old car had already had its plates removed, and was detailed and
12  moved onto the used car lot, the sales manager told her she did not need to see or read the
13  contract, and that she was subsequently taken to a dark room where she was given the contract.
14  (ECF No. 1-1 at 4.) Construing the allegations liberally, the court finds Plaintiff states a
15  colorable claim that Defendants violated TILA by failing to give her the required disclosures
16  prior to consummation of the transaction.
17       Finally, while Plaintiff alleges that Defendants failed to take into account her ability to
18  pay (ECF No. 1-1 at 13), this TILA requirement is inapplicable. 15 U.S.C. § 1665e requires a
19  "card issuer" to consider the ability of a consumer to make the requirement payments "for any
20  consumer under an open end consumer credit plan" in which they are considering whether to
21  open a credit card account or increase a credit limit. Plaintiff is not bringing a claim against a
22  credit card issuer.
23       Plaintiff may proceed with the TILA claims as outlined above against Wallin and
24  Sheppard.
25       **7. Violation of Equal Credit Opportunity Act (ECOA)**
26       Plaintiff alleges she was discriminated against in that she was charged excessive amounts
27  for the car based on her age. (ECF No. 1-1 at 13.)
28

The ECOA is found in Title VII of the Consumer Credit Protection Act, 15 U.S.C. §§ 1601-1693r. It prohibits discrimination by any creditor "against any applicant, with respect to any aspect of a credit transaction ... on the basis of ... age." 15 U.S.C. § 1691(a). It applies to all "credit transactions." *Bros v. First Leasing*, 724 F.2d 789, 791 (9th Cir. 1984). A "creditor" under the ECOA is "any person who regularly extends, renews, or continues credit." 15 U.S.C. § 1691a(e). "Credit" is "the right granted by a creditor to a debtor to defer payment of debt or to incur debts and defer its payment or to purchase property or services and defer payment therefor." 15 U.S.C. § 1691a(d). A creditor does not discriminate by considering "the age of an elderly applicant when the age of such applicant is to be used by the creditor in the extension of credit in favor of such applicant[.]" 15 U.S.C. § 1691(b)(4).

The ECOA requires a creditor to notify an applicant within thirty days after receipt of the application of the action taken, and if adverse action is taken, the applicant is "entitled to a statement of reasons for such action from the creditor." 15 U.S.C. § 1691(d)(1), (2). The creditor may fulfill this obligation by:

> (A) providing statements of reasons in writing as a matter of course to applicants against whom adverse action is taken; or
> (B) giving written notification of adverse action which discloses (i) the applicant's right to a statement of reasons within thirty days after receipt by the creditor of a request made within sixty days after such notification, and (ii) the identity of the person or office from which such statement may be obtained. Such statement may be given orally if the written notification advises the applicant of his right to have the statement of reasons confirmed in writing on written request.

15 U.S.C. § 1691(d)(2)(A)-(B).

An applicant may sue for a violation of the ECOA when a creditor takes adverse action (denial or revocation of credit, change in terms of credit arrangement, or refusal to grant credit in the amount or on the terms requested), without giving the required notice. 15 U.S.C. § 1691(d), § 1691e

Plaintiff alleges that she was did not receive an adverse action letter (presumably when she was ultimately denied financing for the vehicle). (ECF No. 1-1 at 13.)  She also claims that based on her age she was given excessive finance charges as compared to others. (*Id*.)

1    Liberally construing Plaintiff's pro se allegations, the court finds she states a colorable
2    claim for violation of the ECOA against Wallin, Sheppard, and Santander Consumer USA Inc.
3    (for Chrysler Capital). She included no specific allegations with respect to Waite or Marchionne;
4    therefore, the claim will not proceed against those defendants, but Plaintiff may seek leave to
5    amend her complaint in this regard pursuant to Federal Rule of Civil Procedure 15 and any
6    scheduling order issued by the court.

### 8. Theft of Her Trade-In

Plaintiff was told she could not get her car back, and if she did not make payments on the Fiat, it would be repossessed. (ECF No. 1-1 at 14.) Defendants' agent apparently did try to repossess the Fiat. (*Id*.)

Plaintiff states a colorable claim for conversion under Nevada law against Sheppard[4]. *See Evans v. Dean Witter Reynolds, Inc.*, 5 P.3d 1043, 1048, 116 Nev. 598, 606 (Nev. 2000) (citation omitted) ("Conversion is 'a distinct act of dominion wrongfully exerted over another's personal property in denial of, or inconsistent with his title or rights therein or in derogation, exclusion, or defiance of such title or rights.'").

### III. CONCLUSION

(1) Plaintiff's application to proceed IFP (ECF No. 1) is **GRANTED**. Plaintiff is permitted to maintain this action to conclusion without the necessity of prepayment of fees or costs or the giving of security therefor. This order granting in forma pauperis status does not extend to the issuance of subpoenas at government expense.

(2) The Clerk shall **FILE** the complaint (ECF No. 1-1).

(3) Plaintiff's complaint may proceed with the following claims: Count I-elder abuse under Nevada law against Wallin and Sheppard; Count II-fraud under Nevada law against Wallin and Sheppard; Count III-fraud in the inducement under Nevada law against Wallin and Sheppard; Count IV- deceptive trade practices under Nevada law against Wallin and Sheppard; Count V-intentional infliction of emotional distress under Nevada law against Wallin and Sheppard; Count VI-the TILA claims outlined above against Wallin and Sheppard; Count VII-

---

[4] At that point, she was told that Wallin had quit. (ECF No. 1-1 at 5.)

the ECOA claims outlined above against Wallin, Sheppard, and Santander Consumer USA, Inc. (for Chrysler Capital)[5]; Count VIII-a conversion claim under Nevada law against Sheppard.

(4) The Clerk shall **ISSUE** a summons for each of the named defendants and send Plaintiff copies of the complaint and service of process forms (USM-285). Plaintiff should be given twenty days to complete the USM-285 form and return it to the U.S. Marshal to complete service upon the defendants. Within twenty days of receiving from the U.S. Marshal a copy of the USM-285 form showing whether service has been accomplished, Plaintiff should be directed to file a notice with the court indicating whether the defendants were served. If service was not effectuated, and if Plaintiff wishes to have service attempted again, he must file a motion with the court providing a more detailed name and/or address for service of the unserved defendants, or indicating that some other method of service should be attempted. Plaintiff should be reminded that pursuant to Rule 4(m) of the Federal Rules of Civil Procedure, service must be accomplished within ninety days of the date of any order adopting this Report and Recommendation.

**IT IS SO ORDERED**.

DATED: August 16, 2016.

_____
WILLIAM G. COBB
UNITED STATES MAGISTRATE JUDGE

---

[5] She did not include allegations against Waite or Marchionne, but may seek leave to amend her complaint in this regard pursuant to Federal Rule of Civil Procedure 15 and any scheduling order issued by the court.